

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TRANS-PACIFIC SHIPPING CO. | * | CIVIL ACTION |
| VERSUS | * | NO. 00-0389 |
| BLUE CLOUD SHIPPING & TRADING | * | SECTION "K" |
| *    *    *    *    *    *    *    *    * | * | MAGISTRATE (2) |

## OPPOSITION TO MOTION TO COMPEL

MAY IT PLEASE THE COURT:

Blue Cloud Shipping & Trading Co. ("Blue Cloud"), the owners of the M/V EL FLAMENCO, have moved to compel plaintiff, Trans-Pacific Shipping Co. ("Trans-Pacific"), the owners of the M/V CHINA SPIRIT, to produce certain categories of documents allegedly related to the damages sustained by the M/V CHINA JOY on 4 February 2000. On that date, the M/V CHINA JOY was struck on her stern by the M/V EL FLAMENCO, while the M/V CHINA JOY was lying at anchor in the Mississippi



River. The M/V EL FLAMENCO has stipulated to liability in this incident. Therefore, the only issue in this case concerns the quantum of Trans-Pacific's damages.[1] Trans-Pacific opposes Blue Cloud's motion to compel because the documents sought are not reasonably calculated to lead to the discovery of admissible evidence and the requests are otherwise overbroad.

## BACKGROUND

Apart from inquiries into charter hire and crew wages, Blue Cloud's discovery requests focus on the issue of non-collision related repairs. Blue Cloud appears to allege that non-collision relation repairs performed in conjunction with collision related repairs somehow delayed the vessel, thereby increasing Trans-Pacific's claim for loss of use damages. However, as described more fully below, Blue Cloud already has in its possession significant documentation describing these non-collision related repairs. More importantly, these documents also establish that the non-collision related repairs did <u>not</u> delay the vessel. Consequently, the requests are not reasonably calculated to lead to discovery of admissible evidence and should be denied.

The M/V CHINA SPIRIT was struck by the M/V EL FLAMENCO on 4 February 2000 and sustained significant damage to her stern. (See, Photographs attached as

---

[1]  The court has scheduled a settlement conference in this matter for 23 August 2001.

Exhibit "A"). At the time, the M/V CHINA SPIRIT was scheduled to load a grain cargo bound for Kobe, Japan on 5 February 2000. However, due to the damage caused in the incident, the vessel required repairs before loading could commence. The vessel's classification society, the American Bureau of Shipping ("ABS") surveyed the vessel on 5 February 2000 and made recommendations regarding the repairs to be performed. (See, 9 February 2000 ABS Damage Survey, attached as Exhibit "B").

Additionally, the Salvage Association, on behalf of the CHINA SPIRIT's hull and machinery underwriters, surveyed the damage to the vessel on 5 February 2000. (See, 8 March 2000 Salvage Association Survey Report, attached as Exhibit "C"). The damage to the M/V CHINA SPIRIT also was surveyed by Ben Haveman at Technical Maritime & Associates, Inc., who was acting on behalf of Blue Cloud. (See, 5 February 2000 Technical Maritime Associates Survey Report, attached as Exhibit "D"). Like ABS and the Salvage Association, Haveman identified the damages sustained by the CHINA SPIRIT in the incident and made recommendations for its repair. Thus, within hours of the incident, numerous parties had determined what damage was sustained in the incident and had preliminarily determined the nature of the repairs that would be required.

Shortly after the incident, the owners of the M/V CHINA SPIRIT obtained estimates for permanent repairs to be conducted in the Gulf South area. Bids for these repairs were received from Bender Shipbuilding & Repair Co., Inc. ("Bender") and

Boland Marine & Manufacturing Co., Inc. ("Boland"). Bender's estimate for these permanent repairs totaled $576,205.00 and Bender anticipated that it would take fifteen days to complete the repairs. Boland's estimate for these permanent repairs totaled $406,253.00 and Boland anticipated it would take twenty days to complete the repairs.

In an effort to reduce the cost associated with the repairs, the owners of the CHINA SPIRIT decided to conduct temporary repairs with limited delay and expense in New Orleans, so that the vessel could load her cargo and complete her intended voyage to Kobe, Japan. (See, 8 February 2000 ABS telefax approving temporary repair, attached as Exhibit "E"). Thereafter, the vessel would undergo permanent repairs in an Asian shipyard at significantly reduced cost.

Temporary repairs were performed in New Orleans by Boland and these repairs were completed on 8 February 2000. The vessel began loading her intended cargo later that day and, ultimately, completed her voyage to Japan. In the interim, the owners of the M/V CHINA SPIRIT obtained estimates from various Asian shipyards. (See, Spreadsheet of Estimates, attached as Exhibit "F"). Permanent repairs were performed at the Shanghai Lifeng Shipyard, in Shanghai, China, for the total sum of $52,671.60. (See, Claim Statement, attached as Exhibit "G", at Item 18). These repairs, including sailing time from Japan to China, were completed in 15 days. Obviously, substantial damage repair costs and consequential damages were saved by Trans-Pacific's decision

to perform permanent repairs in the Far East rather than the United States. While in China undergoing repairs at the Shanghai Lifeng Shipyard, the vessel was again surveyed by ABS, the Salvage Association and Mr. Bernard Teale, a surveyor representing Blue Cloud. (See, 14 April 2000 ABS Survey Report concerning collision repairs and non-collision related, attached as Exhibit "H"; 8 May 2000 Salvage Association Report, attached as Exhibit "I"; and 28 April 2000 Andrew Moore & Associates, Inc. Survey Report, attached as Exhibit "J").

Trans-Pacific's damages claim includes the expenses associated with the permanent and temporary repairs, the vessel's loss of use, and various miscellaneous expenses. On 22 August 2000, undersigned counsel forwarded to counsel for Blue Cloud a detailed Claim Statement, including supporting documentation, setting forth each item of the damages incurred by the owners as a result of being struck by the M/V EL FLAMENCO. (Exhibit "G"). Ten months after the Claim Statement was submitted, Blue Cloud propounded discovery requests to Trans-Pacific on 13 June 2001, requesting documentation that either was previously produced in the Claim Statement, had been obtained by Blue Cloud from ABS via subpoena, was already available from other sources or was largely irrelevant.[2] Trans-Pacific timely responded to these discovery

---

[2]/ The court will note that Blue Cloud's various requests refer to "Voyage Nos. 35, 36 and 37." For the Court's reference, Voyage No. 35 was a voyage charter that ended in Mobile, Alabama on 15 January 2000, prior to the 4 February 2000 incident.

requests on 10 July 2001, by producing some additional documentation and agreeing to produce additional documentation at a later date, but Trans-Pacific objected to numerous other requests. (See, discovery responses, attached as Exhibit "K"). These responses were supplemented on 30 July 2001. (See, 30 July 2001 letter to counsel, attached as Exhibit "L"). Trans-Pacific submits that its objections to Blue Cloud's discovery requests are well founded and should be maintained.

Turning now to the specific requests for production of documents at issue in Blue Cloud's motion to compel, Trans-Pacific responds as follows:

### REQUEST NOS. 1 AND 2:

These requests both pertain to charter parties and/or correspondence relating to fixing of charter parties. This portion of the motion to compel is not disputed as these documents previously have been requested from Trans-Pacific and will be produced on receipt.

### REQUEST NO. 3:

This request seeks "any and all engine room, engineers, fuel and/or deck logs for voyage Nos. 35, 36 and 37." Trans-Pacific maintains that this request is overbroad and

---

Voyage No. 36 refers to the voyage from New Orleans to Japan, which included the incident at issue. Voyage No. 37 commenced immediately after the repairs were performed in Shanghai, China. The M/V CHINA SPIRIT was under time charter for both Voyage 36 and 37.

seeks immaterial and/or irrelevant documentation that is not reasonably calculated to lead to the discovery of admissible evidence.

Blue Cloud suggests that these logs are relevant to determine the vessel's "fuel consumption." First, fuel consumption is only an issue during the off-hire periods in New Orleans and Shanghai. Thus, records for fuel consumption falling outside this period are irrelevant. Second, Trans-Pacific already has produced records showing the expenses it incurred for fuel consumed during the off-hire periods while the vessel underwent the temporary repairs in New Orleans, permanent repairs in Shanghai, and deviation to Shanghai. (Exhibit "G", at Items 10 and 19). The fuel ("bunkers") consumed during these periods was owned by the vessel's time charterers ("TORM"), who alone accounted for and billed Trans-Pacific for these bunkers. Consequently, Trans-Pacific's claim for fuel consumption is actually based on the amount it was charged by the vessel's time charterers. This information is fully reflected in the documents previously produced. Finally, any additional information related to "fuel consumption" during these off-hire periods would not be in the owners' possession or control, as Trans-Pacific did not own the bunkers involved. (Exhibit "L").

Citing problems encountered with the vessel's main engine during the voyage to Japan, Blue Cloud also claims these records are necessary to determine whether non-collision related repairs were performed in Shanghai. The vessel did experience a

problem with the main engine en route to Japan, but the main engine problems are unrelated to the collision and repairs were not performed in Shanghai. (See, 13 March 2000 ABS e-mail message, attached as Exhibit "M"; 27 March 2000 ABS Report, attached as Exhibit "N"). Blue Cloud has failed to show how requested logs and other records will lead to any evidence whether non-collision repairs were performed in China or delayed the vessel.

Blue Cloud already has in its possession five survey reports discussing the collision related repairs performed in Shanghai and the non-collision related repairs performed in Kobe and Shanghai. First, an ABS survey report, dated 27 March 2000, confirms that repairs to the main engine piston crown were completed to the class society's satisfaction in Kobe, Japan, before the vessel departed for China to perform permanent repairs. (Exhibit "N"). This repair clearly is not part of the owner's claim. Second, Blue Cloud has survey reports from ABS, the Salvage Association and its own surveyor based in Shanghai, which all detail the collision and non-collision related repairs performed in Shanghai. (Exhibits "H", "I" and "J"). Bernard Teale, Blue Cloud's own surveyor, discusses miscellaneous non-collision related repairs performed at Shanghai and confirms that these repairs did not delay the vessel.[3] (Exhibit "J", p. 6 at

---

[3]    Mr. Teale also mentions repairs performed to the vessel's main engine turbocharger as a possible cause of delay. (Exhibit "J", p. 8 at ¶5.4 and 5.5). But the ABS report, dated 14 April 2000, confirms that repairs to the main engine turbocharger

¶4.5: "Such work . . . is of a minor nature, would take place concurrently with, and be completed long before, the repairs in the aft peak tank."). The ABS and Salvage Association reports further confirm that these non-collision related repairs did not interfere with or delay the collision repairs or the vessel's departure from Shanghai. (Exhibit "H", Miscellaneous Hull Repairs/Miscellaneous Machinery and Electrical Repairs; Exhibit "I", p. 6). In light of this quantum of information detailing the substance of the collision and non-collision related repairs, any additional documentation on this point would be cumulative and not reasonably calculated to lead to the discovery of admissible evidence.

Finally, Blue Cloud has in its possession a copy of the repair bill from the Shanghai Lifeng Shipyard for the collision related repairs, which confirms that Trans-Pacific has made absolutely no claim for any repair unrelated to the collision. (Exhibit "G", Item 16).

In summary, Blue Cloud has in its possession documentation that conclusively establishes that (1) non-collision related repairs were performed, (2) these non-collision related repairs are not included in the instant claim and (3) the non-collision related

---

were completed to the classification society's satisfaction on 14 April 2000, before the vessel's departure. (Exhibit "H", Miscellaneous Machinery and Electrical Repairs).

repairs did not delay the vessel. Consequently, Blue Cloud's motion to compel, as it relates to Request No. 3 must be denied.

**REQUEST NO. 4:**

This request should be denied for the same reasons set forth above in opposition to Blue Cloud's Request No. 3.

**REQUESTS NOS. 5, 13 AND 14:**

These requests seek information relating to crew wages on voyage Nos. 35, 36 and 37. Trans-Pacific claims damages related to crew wages for the following periods:

> 4-8 February 2000 Delay in New Orleans; and
> 1-16 April 2000 Deviation to and Delay in Shanghai.

Trans-Pacific already has produced the monthly payroll ledger for February 2000 and the Master's statement concerning wages, victuals, and overtime incurred at Shanghai, which detail the wages claimed in relation to the off-hire periods in both New Orleans and Shanghai. (Exhibit "G", Items 11 and 20). Although Trans-Pacific is voluntarily attempting to obtain additional crew wage records from the vessel's crewing agency (Exhibit "L"), Blue Cloud's request for this crew wage information from other voyages is totally irrelevant and immaterial to the issues presented in this case. Thus, the motion to compel in relation to Request Nos. 5, 13 and 14 should be denied.

**REQUEST NO. 9:**

With this request, Blue Cloud seeks copies of documents sent to or from Shanghai Lifeng Shipyard to (1) "confirm the cost associated with collision repairs" and (2) to determine the number of days the vessel "may have been" in drydock for repairs unrelated to the collision. Because Blue Cloud already has this information, this request should be denied.

Blue Cloud was provided a copy of Shanghai Lifeng Shipyard's detailed invoice, which itemizes the "cost associated with the collision repairs." (Exhibit "G", Item 16). Thus, this request for documentation concerning the cost of permanent repairs has been fully satisfied.

Also, records have been produced that establish the length of the vessel's stay at the Shanghai Lifeng Shipyard, which was solely determined by the collision-related repairs. (Exhibits "H", "I" and "J"). Mr. Teale, Blue Cloud's surveyor in Shanghai, confirmed that the vessel's collision-related repairs were not yet complete on his last visit to the vessel on 14 April 2000. (Exhibit "J", p. 7, ¶5.2). Mr. Teale also confirmed that vessel traffic in the shipyard and heavy weather at anchorage precluded bunkering operations. (Exhibit "J", p. 8, ¶5.3). Trans-Pacific also produced correspondence (e-mails) from its agent in Shanghai detailing the problems encountered with bunkering at Shanghai after repairs were completed on 14 April 2001. (See, 14 and 17 April 2000 e-mail messages, attached as Exhibit "O"). These records also show that, after bunkering,

the vessel departed Shanghai at 0730 hours LT on 16 April 2000. (Id.). Consequently, Trans-Pacific submits that there are no documents, not previously produced, that are responsive to this request. As a result, this request should be denied.

**REQUEST NO. 17:**

In this request, Blue Cloud moves to compel production of all surveys performed on the CHINA SPIRIT during the period 1997 through 2001, without limitation. Blue Cloud claims this is necessary to aid it in determining "if any of the repairs were unrelated to the collision." But Blue Cloud already has the entire ABS file on this vessel, which contains all classification society surveys performed during the period 1994 through 2001. Moreover, Blue Cloud has no less than nine (9) survey reports in its possession related to both collision and non-collision related repairs performed in either New Orleans or China. None of these surveyors have suggested the damage repairs claimed by Trans-Pacific were damages not related to this allision. Quite simply, Blue Cloud has had several surveyors inspect the vessel and these surveyors have adequately reported on the substance of both the collision and non-collision related repairs. This overbroad request should be denied.

**REQUEST NO. 20:**

This request seeks documents evidencing "utilization rates" for the CHINA SPIRIT during the period 10/1/99 through 10/1/00. Trans-Pacific does not maintain

"utilization rates," as such, but are currently attempting to determine any time the vessel was not working during this period. (Exhibit "L", at Item 9). Additionally, the Fifth Circuit case law is clear that when a vessel damaged in a collision is detained for collision repairs less than or equal to the charter period, a 100% utilization rate is appropriate to calculate the detention damages. Marine Transport Lines, Inc. v. M/V TAKO INVADER, 37 F.3d 1138, 1140-41 (5th Cir. 1994). Since the M/V CHINA SPIRIT collision damage repairs were performed in less than the charter period, the requested documentation is irrelevant and immaterial because the vessel's actual utilization rate at the time of the accident was 100%. Consequently, this request should be denied.

**REQUEST NO. 21:**

This request seeks documentation concerning "utilization rates" for vessels in Trans-Pacific's fleet, other than the CHINA SPIRIT. Trans-Pacific objects to this request as it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, for the reasons cited in response to Request No. 20, this request should be denied.

**REQUEST NO. 25:**

Blue Cloud requests copies of all estimates provided for the permanent repairs, which it claims is necessary to determine if the repair expenses at issue are reasonable. A

spreadsheet relating the identity and amount of the numerous shipyard bids has been produced, which establishes Shanghai Lifeng Shipyard was the lowest cost bidder in terms of repair cost and time expected to complete the repairs. (Exhibit "F"). This documentation is more than sufficient to determine whether the repair costs were reasonable. For this reason, the request should be denied.

**REQUEST NO. 27:**

For the reasons set forth in response to Request Nos. 3, 9 and 17 above, this request should be denied.

## CONCLUSION

The motion to compel filed by defendant, Blue Cloud, should be denied. Blue Cloud already has documentation on virtually every request, and the additional documents requested are overbroad and not reasonably calculated to lead to the discovery of admissible evidence.

Respectfully submitted,

MURPHY, ROGERS & SLOSS

_____
Robert H. Murphy, T.A. #9850
Scott E. Oliphant #23885
701 Poydras Street
400 One Shell Square
New Orleans, LA 70139
Telephone: (504) 523-0400
Attorneys for Trans-Pacific Shipping
Company, as Owner of the M/V CHINA
SPIRIT

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have on this 7th day of August 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, either by hand, by telefax or by placing same in the United States Mail, properly addressed, and first class postage prepaid.

_____

300/1662

15

**SEE RECORD FOR EXHIBITS OR ATTACHMENTS NOT SCANNED**